# EXHIBIT D

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

RICHARD REINHARDT
(pka RICHIE RAMONE and RICHIE
BEAU), an individual

Plaintiff,

-against-

JOHN CUMMINGS (aka JOHN RAMONE
and JOHNNY RAMONE), an individual;
TACO TUNES, INC., a New York
corporation; RAMONES PRODUCTIONS,
INC., a New York company; HERZOG &
STRAUS, a New York partnership; IRA
HERZOG, an individual,

Defendants.

Index No. 04/601064

FIRST AMENDED COMPLAINT

Plaintiff Richard Reinhardt by and through his attorneys, Roberts & Ritholz LLP, alleges as follows:

## INTRODUCTION

1.    From 1983 to 1987, Plaintiff Richard Reinhardt (professionally known as "Richie Ramone" and "Richie Beau") was the drummer for iconic New York punk rock band, the Ramones.

2.    During his tenure with the Ramones, Plaintiff performed in approximately 400 live shows, recorded more than fifty tracks across twelve albums, wrote and composed six Ramones songs, and was featured on three of the Ramones studio albums—*Too Tough to Die*, *Animal Boy*, and *Halfway to Sanity*. Despite Mr. Reinhardt's significant and enduring

contributions to the Ramones and their legacy, Plaintiff has been paid only a small fraction of the royalties and other compensation due to him.

3.    The Defendants include the late John Cummings (p/k/a Johnny Ramone), Ramones Productions and Taco Tunes—the corporate entities through which Mr. Cummings operated and dominated the Ramones' business affairs—and their managers and accountants, Herzog & Strauss and Ira Herzog, individually. The Defendants, at all relevant times, acted in concert to deprive Mr. Reinhardt of critical information, proper credit for his musical accomplishments and royalties and other payments due to him.

4.    This action seeks redress for Mr. Reinhardt's injury, and asserts causes of action for breach of contract, breach of fiduciary duty, fraud, negligent misrepresentation and constructive trust, all relating to the record royalties and other funds that have been collected by the Defendants and neither paid nor accounted for to Mr. Reinhardt.

<u>**THE PARTIES**</u>

5.    Plaintiff Richard Reinhardt is an individual residing in Scottsdale, Arizona.

6.    Upon information and belief, Defendant John Cummings (p/k/a "Johnny Ramone"), at the time of his death in September 2004, resided in Los Angeles, California, and is succeeded by the John Estate.

7.    Upon information and belief, Defendant Ira Herzog is an individual residing in New York, New York. Mr. Herzog is a certified public accountant.

8.    Upon information and belief, Defendant Herzog and Straus is a New York partnership with its principal place of business in New York, New York. Mr. Herzog is a principal of Herzog and Straus. (Defendant Herzog individually and Herzog and Straus are referred to collectively as the "Herzog Defendants".)

9.    Upon information and belief, Defendant Ramones Productions, Inc. is a New York corporation with its principal place of business in New York, New York. Ramones Productions operates the non-publishing business of the Ramones. At all relevant times prior to his death, Mr. Cummings exercised complete control over Ramones Productions, and pursuant to Mr. Cummings' instructions, Mr. Herzog managed (and continues to manage) Ramones Productions on a day-to-day basis.

10.    Upon information and belief Defendant Taco Tunes, Inc. is a New York Corporation with its principal place in New York, New York. Taco Tunes acts as the publisher of many of the Ramones' songs. At all relevant times prior to his death, Mr. Cummings exercised complete control over Taco Tunes, and pursuant to Mr. Cummings' instructions, Mr. Herzog managed (and continues to manage) Taco Tunes on a day-to-day basis.

## FACTS COMMON TO ALL CAUSES OF ACTION

11.    In 1984, Mr. Reinhardt entered into a recording agreement with Ramones Productions (the "Recording Agreement" annexed here as Exhibit A). The Recording Agreement provides, *inter alia*, for Ramones Productions to make royalty payments to Plaintiff based on his performances on sound recordings created by the Ramones. The Recording Agreement was signed by Mr. Herzog on behalf of Ramones Productions and Taco Tunes.

12.    Specifically, the Recording Agreement provides for the Ramones to share their record royalties with Plaintiff on recordings on which he performed. Mr. Reinhardt is entitled to 11.8% of the Ramones' royalties for recordings from the first album on which he performed, 18.9% on the second, 23% on the third, and 25% on all other recordings.

13.     While the Recording Agreement contemplated that Plaintiff would enter into an agreement with Defendant Taco Tunes respecting music publishing rights, the parties never entered into such an agreement.[1]

14.     From the time that *Too Tough to Die* was released in 1984 through the present, Defendants have continuously collected revenues attributable to Plaintiff's work. These revenues reflect royalties attributable to sound recordings on which Plaintiff performed, master use fees from motion picture and video uses, licensing fees from record companies outside the United States and Mr. Reinhardt's music publishing income, wrongly collected by Taco Tunes.

15.     At all times relevant to this Action, the Herzog Defendants acted as agents for Mr. Cummings, Ramones Productions and Taco Tunes.  The Herzog Defendants undertook all responsibility for collecting funds attributable to Plaintiff's work and distributing (or withholding) the same to Plaintiff.

16.     Although numerous Ramones recordings featuring the Plaintiff were commercially exploited in the 1980s and 1990s, defendants never delivered a accounting statement or payment to Plaintiff until some time in 2002, after he and his representatives confronted Mr. Herzog about withheld funds.

17.     In the fall of 2001, Mr. Reinhardt was informed by the Ramones' long time road manager that he was owed "tons of money."

18.     In or about October 2001, Mr. Reinhardt's wife, Annette Stark, contacted Herzog and inquired about Mr. Reinhardt's royalties and accounting statements. Herzog responded that Plaintiff was not due anything, but that he would confer with Cummings.

---

[1] A separate action pending in the United States District Court for the Southern District of New York asserts copyright infringement claims against some of the Defendants arising from the unauthorized use of songs written by Mr. Reinhardt. The causes of action here peripherally implicate Defendants' conduct relating to those compositions; however, such causes of action relate only to the Defendants wrongful collection and retention of Plaintiffs' funds, and not to the underlying acts of copyright infringement.

19.     In or about November 2001, Ms. Stark again contacted Mr. Herzog by telephone to follow up on her earlier request for information. Having reviewed the Recording Agreement, Ms. Stark noted that Mr. Reinhardt was entitled to royalties ranging from 11.8% to 25% of record sales.

20.     Herzog told Ms. Stark that she was mistaken, that the Ramones recordings had not generated any funds for years, and that, in any event, Richie had signed a "new contract", which set royalties at a flat 12.5%, but that "12.5% of zero is zero.".

21.     Ms. Stark asked if Mr. Herzog would provide a copy of the "new contract". Mr. Herzog replied that he would have to check with Mr. Cummings.

22.     Ms. Stark asked if Mr. Reinhardt could review the Ramones' books to verify that he was not owed any funds. Herzog replied that the "new contract" barred Richie from conducting an audit.

23.     In or about December 2001, Herzog telephoned Ms. Stark and stated that he had "found" approximately $20,000 that was due to Mr. Reinhardt. Ms. Stark told him that she believed that he was owed far more than $20,000. Mr. Herzog replied that this was the most that Mr. Cummings would permit him to pay.

24.     Ms. Stark reiterated her demand that Mr. Herzog permit Mr. Reinhardt and to audit the Ramones' books—specifically that Mr. Reinhardt's representatives be given access to the statements rendered to by Defendants by Warner Records and Rhino Records, the Ramones' Record Companies. Mr. Herzog replied by asking Ms. Stark to provide a listing of all the Ramones tracks and albums on which Richie performed.

25.     Ms. Stark provided the listing of Richie's performances as Herzog requested, along with a copy of the Recording Agreement. In a follow up telephone call in late December

2001, Ms. Stark again demanded that Plaintiff be permitted an opportunity to audit the Ramones'
books and records. Mr. Herzog responded that the Warner/Rhino documents were "proprietary
and confidential". Moreover, Mr. Herzog said that the "new contract" gave him the right to
unilaterally terminate Mr. Reinhardt's right to receive royalties, and that he would do so if Ms.
Stark persisted in requesting the Warner/Rhino statements.

      26.     Ultimately, Mr. Herzog agreed to meet with Ms. Stark's brother Vincent Sbarra, a
certified public accountant, to discuss Mr. Reinhardt's requests. At sometime in January 2002,
Mr. Sbarra visited Mr. Herzog's office.

      27.     Mr. Sbarra showed Mr. Herzog the Ramones Agreement, and the recording detail
that Ms. Stark had prepared in December, noting that Mr. Herzog should apply the applicable
percentage (11.8%, 18.9%, 23% or 25%) to the various recordings on which Plaintiff performed.
Mr. Herzog again responded that Richie had signed a "new contract" that reset the royalty rate to
a flat 12.5%. This time, Mr. Herzog explained, that when applying that 12.5% rate, Richie was
entitled to approximately $32,000.

      28.     Mr. Sbarra asked to review the "new contract", as well as the statements rendered
by Sire, Warner and Rhino records to Ramones Productions. In response, Mr. Herzog replied
that the documents were in storage, the Ramones had not made money "in years", and that
Plaintiff should be grateful that he was offering as much as he was. But, Mr. Herzog cautioned,
if Mr. Sbarra pressed further, Mr. Cummings would become angry and would make sure that
Plaintiff would "never see another dime."

      29.     The day after Mr. Sbarra's meeting's with Mr. Herzog, Mr. Herzog called Ms.
Stark, told her that Mr. Sbarra was no longer permitted in his office, and issued an ultimatum—
either Mr. Reinhardt accept $32,500 and cease demanding an audit, or never get paid anything.

Mr. Herzog reiterated the $32,500 was far more than Richie was owed, and that despite some renewed interest in the Ramones, the recordings had never made any money.

30.    In light of Mr. Herzog's insistence that the Ramones recordings had not resulted in significant royalties, his warning about angering Mr. Cummings and the apparent expense of pursuing an audit that Messrs. Herzog and Cummings apparently would not permit. Plaintiff agreed to accept the $32,500 payment. In January, 2002, Mr. Reinhardt executed a release and settlement agreement.

31.    From 2002 through 2004, Mr. Herzog sent sporadic "statements", that purported to report certain revenues collected by Ramones Productions, along with checks for small amounts, purporting to reflect the true and correct amounts owed to Plaintiff. In most instances, either Mr. Reinhardt or Ms. Stark responded to Mr. Herzog by requesting to review the underlying documents and payments received from Warner and Rhino to verify that the amounts were accurate.

32.    In each instance, in response to Plaintiff's objections, Mr. Herzog insisted that the underlying record company documentation was proprietary information, and would not be disclosed. Mr. Herzog represented that Herzog and Straus *was* the Ramones' management, *it* would aggregate all relevant account information, and transmit the information and funds to which Mr. Reinhardt was entitled. Mr. Herzog again threatened to suspend all payment to Mr. Reinhardt.

33.    Critically, the occasional "statements" delivered by Defendants were prepared by Herzog and Strauss, and did not include reference to underlying payments made to the defendants by their record company distributors. The absence of underlying detail is contrary to

industry custom, and was demonstrably intended to conceal the underlying information from Plaintiff.

34.    Unable to persuade Mr. Herzog to provide accurate information, a copy of the "new contract", or the purported publishing contract, on August 8, 2003, Plaintiff commenced suit against the Defendants.

35.    Upon information and belief, at all times prior to his death in September 2004, Mr. Cummings acted as the de facto business manager of the Ramones. In that regard, Mr. Cummings acted in concert with Ramones Productions, Taco Tunes, Mr. Herzog and Herzog and Strauss to: (i) deprive Mr. Reinhardt (and other members of the Ramones) funds that were due from recordings and music publishing; (ii) exercise unilateral control over the Ramones business matters and legacy; and (iii) deprive Mr. Reinhardt and others their proper credit and attribution for songwriting as well as credit and public attention as members of the Ramones.

### FIRST CAUSE OF ACTION
#### (Breach of Contract—Ramones Productions)

36.    The allegations contained in paragraphs 1 through 35 are repeated and realleged as if set forth fully herein.

37.    Ramones Productions has a continuing contractual obligation to pay royalties to Plaintiff that are attributable to his performances on Ramones' recordings. Specifically, paragraph 8 of the Recording Agremeent provides that such royalties would be calculated on the following basis:

　　a.    With respect to Masters included on or recorded at the same time as the first LP recorded hereunder, Company [Ramones Productions] shall pay Artist a royalty equal to 11.8% of all royalties paid to Company or Credited to Company's account pursuant to the Record Contract;

    b.  With respect to Masters included on or recorded at the same time as the second LP recorded hereunder, Company [Ramones Productions] shall pay Artist a royalty equal to 18.9% of all royalties paid to Company or credited to Company's account pursuant to the Record Contract;

    c.  With respect to Masters included on or recorded at the same time as the third LP recorded hereunder, Company [Ramones Productions] shall pay Artists a royalty equal to 23% of all royalties paid to Company or Credited to Company's account pursuant to the Record Contract;

    d.  With respect to all other Masters recorded hereunder, Company [Ramones Productions] shall pay Artist a full Member's share [25%] of all royalties paid to Company or Credited to Company's account pursuant to the Record Contract.

38.    Mr. Reinhardt recorded four albums governed by the 1984 Contract: *Too Tough To Die*, *Animal Boy*, *Halfway to Sanity*, and the recently released *Ramones Smash You! \* Live '85*. Thus, under the 1984 Contract, Mr. Reinhardt is entitled to receive an 11.8% royalty from tracks released on the initial *Too Tough To Die* album; an 18.9% royalty on tracks released on *Animal Boy*; a 23% royalty on tracks released on *Halfway to Sanity*; and a 25% royalty on tracks released on *Ramones Smash You! \* Live '85*.

39.    Mr. Reinhardt has performed all of his obligations under the 1984 Contract.

40.    Ramones Productions has breached its contract with Mr. Reinhardt by failing to pay royalties in most instances; and in certain instances, by paying royalties at a 12.5% rate, in contravention of the provisions of the Recording Agreement.

41.    As a result of Ramones Productions' breaches of the Recording Agremeent, Plaintiff has suffered damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### (Breach of Fiduciary Duty—All Defendants)

42.    The allegations contained in paragraphs 1 through 41 are repeated and realleged as if set forth fully herein.

43.    In contracting to collect, report, administer and pay royalties and other funds to Mr. Reinhardt, Ramones Productions assumed fiduciary duties to Mr. Reinhardt.

44.    In assuming responsibility for collecting, administering and paying funds due to Plaintiff that are attributable to his music compositions, Taco Tunes assumed fiduciary duties to Plaintiff.

45.    In undertaking the responsibility of collecting, reporting and paying funds to Plaintiff attributable to all of his activities with the Ramones, the Herzog Defendants assumed fiduciary duties to Plaintiff.

46.    By directing Defendants' Ramones Productions, Taco Tunes, Herzog & Strauss and Mr. Herzog to collect and administer Plaintiffs' funds attributable to his activities with the Ramones, and by directing those same Defendants to withhold reports, information and payments from Plaintiff, Defendant Cummings assumed fiduciary duties to Plaintiff.

47.    In failing to account to Mr. Reinhardt and withholding his funds, the Defendants breached their fiduciary duties to Mr. Reinhardt.

48.    Upon information and belief, funds that were collected under the management of the Herzog Defendants were diverted to and for the benefit of the Defendants. In facilitating the diversion of Plaintiff's funds to the Defendants, the Herzog Defendants breached their duty of loyalty to Plaintiff.

49.    As a result of Defendants' breaches of their fiduciary duties, Plaintiff has been injured in an amount to be determined at trial.

## THIRD CAUSE OF ACTION
### (Fraud – Herzog, Herzog & Strauss, Cummings and Ramones Productions)

50.    The allegations contained in paragraphs 1 through 50 are repeated and realleged as if set forth fully herein.

51.    In the course of the 2001-2002 discussions with Ms. Stark and Mr. Sbarra, Mr. Herzog, in his individual capacity, and on behalf of Herzog and Straus as agent for Mr. Cummings and Ramones Productions made the following representations:

    a.    The Ramones had not generated any income from the sale of recordings on which Plaintiff performed during the period 1984 through 2001;

    b.    Plaintiff had signed a "new contract", subsequent to the execution of the Recording Agreement, which (i) reduced Mr. Reinhardt's royalty for recordings to a flat 12.5%; (ii) prohibited Mr. Reinhardt from auditing Ramones Productions' books and records; and (iii) empowered Mr. Herzog to unilaterally suspend all royalty payments to Mr. Reinhardt; and

    c.    Mr. Herzog would make sure that Plaintiff did not receive any funds attributable to his activities as member of the Ramones if he persisted in his request to review statements rendered to the Ramones from their record companies.

52.    Each of the foregoing statements was false when made by Mr. Herzog, on behalf of the Defendants.

53.    The Defendants intended that Plaintiff rely on their misrepresentations in evaluating the proposed settlement agreement.

54.    Mr. Reinhardt, in fact, relied on the Defendants' misrepresentations in electing to enter into the 2002 settlement agreement and accept $32,500 as satisfaction of his claims for past due royalties.

55.    As a result of the Defendants' aforementioned conduct, Plaintiff has suffered injury in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### (Negligent Misrepresentation—As to Cummings, Ramones Productions, and the Herzog Defendants)

56.    The allegations contained in paragraphs 1 through 55 are repeated and realleged as if set forth fully herein.

57.    Each of Cummings, Ramones Productions and the Herzog Defendants, at the time Mr. Herzog made the representations described above, had no reasonable grounds for believing that such representations were true. Each of Cummings and Ramones Productions caused Mr. Herzog make these representations with the intent of inducing Mr. Reinhardt to enter into the settlement agreement and accept $32,500 as payment for all past due record royalties.

58.    As a direct and proximate result of these negligent misrepresentations, Plaintiff has been injured in an amount to be determined at trial.

## FIFTH CAUSE OF ACTION
### (Constructive Trust—All Defendants)

59.    The allegations contained in paragraphs 1 through 58 are repeated and realleged as if set forth fully herein.

60.    From 1984 through the present, the Defendants, and each of them, have collected funds attributable to Mr. Reinhardt's recordings with the Ramones and for music he wrote for the Ramones.

12

61.    Such funds were collected and have been held without accounting or distribution to Plaintiff, in derogation of the Defendants' individual and collective duties to Plaintiff.

62.    Accordingly, this Court should impose a constructive trust on all of Plaintiff's funds collected by any of the Defendants at any time that have not been accounted for and distributed to Plaintiff.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment in its favor against each of Defendants, and respectfully requests that Court grant the following relief:

1.    An award of Plaintiff's direct, indirect, consequential, and compensatory damages in an amount to be determined at trial, but in no event less $250,000;

2.    The imposition of a constructive trust over all funds collected on behalf of Plaintiff by any of the Defendants that have not been distributed to Plaintiff, from the inception of the Plaintiff's relationship with the Defendants to the present;

3.    An award of punitive and exemplary damages in a sum sufficient to deter Defendants from them from similar wrongdoing in the future;

4.    An award of pre-judgment interest on all compensatory damages at the rate provided by applicable law; and

5.    All such other and further relief as the Court may deem just and proper.

DATED:     New York, New York
           November 7, 2007

                              ROBERTS & RITHOLZ LLP

                              By
                              Jeff Sanders (JS-3989)
                              Roberts & Ritholz LLP
                              183 Madison Ave., PH
                              New York, NY 10016
                              Tel: (212) 448-1800
                              Fax: (212) 448-0020
                              Attorneys for Plaintiff Richard Reinhardt

# EXHIBIT E



1  WILLENKEN LOH STRIS LEE & TRAN LLP
2  Jason H. Wilson (Bar No. 140269)
   James M. Lee (Bar No. 192301)
3  Peter K. Stris (Bar No. 216226)
   725 South Figueroa Street, Suite 1690
4  Los Angeles, CA 90017
   Tel: 213-955-9240
5  Fax: 213-955-9250

6  Attorneys for Plaintiff
   Richard Reinhardt

7

8              UNITED STATES DISTRICT COURT

9              CENTRAL DISTRICT OF CALIFORNIA

10                   WESTERN DIVISION

11

12 RICHARD REINHARDT (aka Richie        )  CASE NO.:
   Ramone and Richie Beau), an          )
13 individual,                          )
                                        )
14            Plaintiff,                )  COMPLAINT FOR:
                                        )
15 v.                                   )  (1) TRADEMARK INFRINGEMENT
                                        )  (2) UNFAIR COMPETITION
16 JOHN CUMMINGS (aka JOHN              )  (3) FRAUD
   RAMONE and JOHNNY RAMONE),           )  (4) NEGLIGENT
17 an individual; WARNER BROS.          )      MISREPRESENTATION
   RECORDS, INC., a Delaware            )  (5) BREACH OF CONTRACT
18 corporation; RHINO                   )
   ENTERTAINMENT COMPANY, a             )
19 Delaware corporation; IRA HERZOG,    )  DEMAND FOR JURY TRIAL
   an individual; HERZOG & STRAUS, a    )
20 New York partnership; TACO TUNES,    )
   INC., a New York corporation;        )
21 RAMONES PRODUCTIONS, INC., a         )
   New York corporation; and DOES 1     )
22 through 10 inclusive                 )
                                        )
23            Defendants.               )

24 _____

25

26

27

28

                        -1-

                      COMPLAINT

Plaintiff Richard Reinhardt (hereafter "Plaintiff" or "Mr. Reinhardt") complains of Defendants and alleges as follows:

## INTRODUCTION AND SUMMARY OF THE NATURE OF THIS ACTION

1.    This is a trademark action arising under the Lanham Act.  This case has arisen because the Defendants violated the Lanham Act by falsely designating the composer of "Smash You."  Mr. Reinhardt wrote "Smash You," but the Defendants have falsely attributed the songwriting credit to the Ramones.

2.    Mr. Reinhardt (also known as "Richie Ramone" and "Richie Beau") played drums for the punk rock band called the "Ramones" from 1983 to 1987.  In 2002, the Ramones band was inducted in the Rock and Roll Hall of Fame.

3.    During his tenure with the Ramones, Mr. Reinhardt played drums in approximately 400 live shows, wrote and composed six songs that the Ramones recorded, and drummed on three Ramones studio albums—"Too Tough to Die," "Animal Boy," and "Halfway to Sanity."

4.    While he was in the band, Mr. Reinhardt was openly praised for his songwriting by the late Joey Ramone (also known as Jeffrey Hyman):

"We wanted [Richie] to feel part of the band.  We never let the drummer write before, because John, Dee Dee and I felt like we were the band. Marc Bell [another drummer for the Ramones] would try to give us songs, but they weren't any good—he wouldn't even write them, his brother would. But Richie's a regular Phil Collins." (Hey Ho Let's Go: The Story of The Ramones, by Everett True, Omnibus Press 2002, p. 208; hereafter "The Story of The Ramones.")

-2-

1    5.    Despite his contributions to the Ramones, Mr. Reinhardt's work with

2  the band has consistently been diminished in the official Ramones outlets.  For

3  example, in the official biography,  <u>An American Band</u> by Jim Bessman, Mr.

4  Reinhardt is mentioned in only a couple of sentences.   Indeed, it seems as if a wall

5  of silence has developed about Mr. Reinhardt.  In his recent book, <u>Hey Ho Let's</u>

6  <u>Go:  The Story of The Ramones</u>, Everett True wrote:

7              "Richie Reinhardt played 400 shows with da bruddas [the Ramones]

8              (with Arturo Vega working the lights) after he joined in 1983,

9              appeared on several videos, wrote a handful of songs -- including

10             1986's excellent 'Somebody Put Something In My Drink' UK single -

11             - yet no one I spoke to who was around the Ramones during this

12             period will talk about him." (<u>The Story of The Ramones</u>, p. 182.)

13   6.    Now, the diminishment of Mr. Reinhardt's legacy has turned into theft

14  and misappropriation constituting trademark infringement.   Defendants have

15  misappropriated songwriting credit for Mr. Reinhardt's song "Smash You" on two

16  different recently released albums: (1) the expanded and remastered edition of

17  "Too Tough To Die;" and (2) the bonus compact disk entitled "Ramones Smash

18  You! * Live '85" which was included in the first fifty-thousand (50,000) copies of

19  "Loud, Fast Ramones: Their Toughest Hits."   Both of these albums were released

20  by Defendant Warner Bros. Records, Inc. ("Warner Records") and Defendant

21  Rhino Entertainment Company ("Rhino").

-3-

COMPLAINT

7.      Misappropriating the songwriting credit for "Smash You" is particularly brazen for two reasons.  First, some of the Defendants have acknowledged in writing that Mr. Reinhardt composed "Smash You."  Second, when the Ramones released "Smash You" as a single on the Beggars Banquet label in the United Kingdom in 1985, they gave Mr. Reinhardt, under his alias "Richie Beau," sole credit for the song.  Despite this, Defendants failed to give Mr. Reinhardt songwriting credit when "Smash You" was released in the United States for the first time in or about 2002.  Instead, songwriting credit was falsely attributed to "the Ramones," a songwriting team apparently consisting of John Ramone (aka John Cummings), Dee Dee Ramone (aka Douglas Colvin), and Joey Ramone (aka Jeffrey Hyman).

8.      The misappropriation of "Smash You" is not the only misdeed related to Mr. Reinhardt's work as a Ramone.   Defendant Ira Herzog ("Herzog") has made a number of misrepresentations to Mr. Reinhardt and those who have tried to help him regarding the status of Mr. Reinhardt's royalty payments.   Defendant Herzog, a certified public accountant and a principal in the accounting firm of Herzog and Straus, manages the distribution of the Ramones' royalties in his role as a manager of Defendant Ramones Productions, Inc. ("Ramones Production") and Defendant Taco Tunes, Inc. ("Taco Tunes").  Herzog has repeatedly made false representation to Mr. Reinhardt about the existence and amount of Mr. Reinhardt's royalty income.

-4-

9.     For example, after the death of Joey Ramone in 2001, Mr. Reinhardt learned that Herzog may have additional royalties for him.  When Mr. Reinhardt and his representatives contacted Herzog, Herzog claimed that the Ramones had not made money for years and that only limited additional funds were due.   Mr. Reinhardt attempted to verify Herzog's claim by having an accountant examine the documents related to his royalty payments, but Herzog refused to make such documents available.   Based upon Herzog's representations, in January 2002, Mr. Reinhardt accepted a $32,500.00 payment for past due royalties.  Herzog's representations were false.  Mr. Reinhardt was (and is) owed substantially more money because Herzog has misstated the appropriate royalty percentage.

10.     After receiving the $32,500.00 payment in 2002, Mr. Reinhardt's wife, Annette Reinhardt, on Mr. Reinhardt's behalf, questioned whether the amount paid was a proper representation of royalty payments that were due. Herzog misrepresented to Ms. Reinhardt that he had the power to end Mr. Reinhardt's royalty payments if further doubts were expressed about the appropriateness of those payments.  Herzog's comments had the effect of deterring Mr. Reinhardt from investigating Herzog's calculations regarding the past due royalties.  Herzog's representations were in fact false because he had no right to withhold royalty payments.

-5-

COMPLAINT

11.    Perhaps Herzog's most significant misrepresentation has been his on-going claim that Mr. Reinhardt was (and is) owed only a royalty of 12.50% for the songs that he recorded as a Ramone. Herzog most recently made this claim in a May 2003 letter.  This on-going representation was and is false.  In fact, a 1984 contract (between Mr. Reinhardt and Taco Tunes/Ramones Production) requires that Mr. Reinhardt be paid royalties ranging between 11.8% to 25% on each song depending on which album the song was released.  Indeed, the bulk of Mr. Reinhardt's songs should carry a royalty rate of least 18.9% or higher. Furthermore, under the 1984 contract, Mr. Reinhardt is entitled to songwriting royalties from his publisher, Taco Tunes, based upon his contribution to the song. In other words, Mr. Reinhardt is entitled to 100% of the songwriting royalty if he alone wrote the song.

12.    In an effort to cover-up his fraud, Herzog has never provided Mr. Reinhardt with the original statements from the record companies paying the royalties.  Herzog has done this even though such statements are required under the 1984 agreement.  Instead, on behalf Ramones Productions and Taco Tunes, Herzog has created his own royalty statements.  These statements in themselves are fraudulent as they misrepresent what royalties Mr. Reinhardt is owed. Furthermore, by creating his own statements, Herzog has denied Mr. Reinhardt the ability to check Herzog's calculations against those of record companies paying the Ramones royalties.  Herzog has also refused to allow Mr. Reinhardt to exercise his right under the 1984 contract to inspect the books and records related to royalty payments as permitted under the agreement.

-6-

COMPLAINT

13.    Mr. Reinhardt is informed and believes and on that basis alleges that Defendant John Cummings has long acted as the de facto business manager of the Ramones. Mr. Reinhardt is further informed and believes that Cummings' control over the Ramones' recordings (including those works that Mr. Reinhardt contributed to) has increased after the death of Mr. Hyman. Mr. Reinhardt is informed and believes that the trademark infringement described herein arose, in part, because Cummings has long harbored ill will for him. For example, while Mr. Reinhardt was a member of the Ramones, Cummings made repeated efforts to exclude Mr. Reinhardt's compositions from the Ramones' albums. Indeed, Mr. Reinhardt is informed and believes that it is for this reason that "Smash You" was initially released in the United Kingdom as opposed to the United States. Mr. Reinhardt is informed and believes and on that basis alleges that Cummings has conspired with Herzog in a fraudulent scheme: (1) to avoid paying Mr. Reinhardt his appropriate share of royalties since his departure from the band, and (2) to eliminate Mr. Reinhardt's songwriting credit from "Smash You."

14.    In this suit, Mr. Reinhardt seeks damages from all Defendants for trademark infringement based upon their misappropriation of the songwriting credit for the song "Smash You." Mr. Reinhardt also seeks damages from Herzog personally and his accounting firm of Herzog & Straus for fraud and negligent misrepresentation based upon Herzog's misrepresentations and his mishandling of Mr. Reinhardt's royalty payments. Furthermore, Mr. Reinhardt is seeking damages from Cummings for fraud and negligent misrepresentation based upon Cummings' conspiracy with Herzog. Finally, Mr. Reinhardt is seeking breach of contract damages from Taco Tunes and Ramones Productions based upon their failure to abide by the 1984 contract between these two entities and Mr. Reinhardt.

-7-

COMPLAINT

## JURISDICTION AND VENUE

15.    This action arises under the trademark laws of the United States, Title 15, United States Code, the statutory and common law of unfair competition, and other California state law claims.  The jurisdiction of this Court is founded upon 28 U.S.C. §§ 1331 and 1338, as well as principles of supplemental jurisdiction found in 28 U.S.C. § 1367.

16.    Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b) and 1391(c).  Defendants are subject to personal jurisdiction in the Central District of California; the infringing materials that are the subject of this litigation were distributed and offered for distribution in this district; and the claims alleged in this action arose in this district.

## THE PARTIES

17.    Plaintiff Richard Reinhardt is an individual residing in the County of Los Angeles, California.

18.    Based upon information and belief, Mr. Reinhardt alleges that Defendant John Cummings (also known as "John Ramone" or "Johnny Ramone") is an individual residing in the County of Los Angeles, California.

19.    Based upon information and belief, Mr. Reinhardt alleges that Defendant Warner Bros. Records, Inc. ("Warner Records") is a Delaware corporation with its principal place of business at 3300 Warner Blvd., Burbank, California 91505.

20.    Based upon information and belief, Mr. Reinhardt alleges that Defendant Rhino Entertainment Company ("Rhino") is a Delaware corporation

-8-

COMPLAINT

1  with its principal place of business at 10635 Santa Monica Blvd., Los Angeles,
2  California 90025.

3         21.    Based upon information and belief, Mr. Reinhardt alleges that
4  Defendant Ira Herzog ("Herzog") is an individual residing in New York, New
5  York. Herzog is a certified public accountant.

6         22.    Based upon information and belief, Mr. Reinhardt alleges that
7  Defendant Herzog and Straus is a New York partnership with its principal place of
8  business in New York, New York. Herzog is a principal of Herzog and Straus and
9  Mr. Reinhardt alleges on information and belief that Herzog and Straus is an alter
10 ego of Herzog.

11        23.    Based upon information and belief, Mr. Reinhardt alleges that
12 Defendant Taco Tunes, Inc. ("Taco Tunes") is a New York corporation with its
13 principal place in New York, New York. Mr. Reinhardt is informed and believes
14 that Taco Tunes is the publisher of many of the Ramones' songs—including a
15 number of songs, such as, "Smash You," written by Mr. Reinhardt. Mr. Reinhardt
16 is informed and believes that Cummings has de facto control over Taco Tunes; and
17 that, pursuant to Cummings' instructions, Herzog manages Taco Tunes on a day-
18 to-day basis.

19        24.    Based upon information and belief, Mr. Reinhardt alleges that
20 Defendant Ramones Productions, Inc. ("Ramones Productions") is a New York
21 corporation with its principal place of business in New York, New York. Mr.
22 Reinhardt is informed and believes that Ramones Productions controls the non-
23 publishing business of the Ramones. Mr. Reinhardt is further informed and
24 believes that Cummings has de facto control over Ramones Productions; and that,
25 pursuant to Cummings' instructions, Herzog manages Ramones Productions on a
26 day-to-day basis.

27        25.    Mr. Reinhardt is unaware of the true names and capacities, whether
28

-9-

COMPLAINT

1    individual, corporate, associate or otherwise, of Defendants Does 1 though 10,
2    inclusive, or any of them, and therefore sues these Defendants, and each of them,
3    by such fictitious names.  The Doe Defendants include persons and entities
4    assisting or acting in concert with the named Defendants in connection with the
5    actions complained of herein and include persons who and entities that have
6    reproduced, displayed, and distributed Mr. Reinhardt's work infringed by
7    Defendants as alleged below.  Mr. Reinhardt will seek leave of this Court to amend
8    this Complaint when the status and identities of these Defendants are ascertained.
9
10                   FACTS GIVING RISE TO THIS ACTION
11
12        26.    The Ramones band was formed in 1974 and is widely recognized as
13    one of the most influential American punk band.   In 2002, the Ramones band was
14    inducted into the Rock and Roll Hall of Fame.
15        27.    In 1983, Mr. Reinhardt joined the Ramones.  While with the band,
16    Mr. Reinhardt played on three of the Ramones' fourteen studio albums: "Too
17    Tough To Die," "Animal Boy," and "Halfway To Sanity."
18        28.    As with other members of the Ramones, Mr. Reinhardt assumed the
19    surname alias of "Ramone" and was known as "Richie Ramone."  In addition, Mr.
20    Reinhardt was known as "Richie Beau."
21        29.    In or about 1984, Mr. Reinhardt wrote and composed the song
22    "Smash You."  "Smash You" was included on the B-Side of the Ramones'
23    "Howling at the Moon" which was released as a seven inch single in the United
24    Kingdom on the Beggars Banquet label in February of 1985.  A true and correct
25    copy of the front and back side of the single as well as the single's sleeve is
26    attached as Exhibit "1."  As the record clearly shows, "Smash You" was written
27    and composed by Richie Beau--Mr. Reinhardt's alias.  "Smash You" was also
28

-10-

1  released on the Beggars Banquet label as part of a two seven inch record set in
2  March of 1985. A true and correct copy of the front and back of the "Smash You"
3  record in this release as well as the front, center, and back of this two seven inch
4  single set is attached hereto as Exhibit "2." On this record as well, "Smash You" is
5  credited to Richie Beau.

6       30.    In addition, Mr. Reinhardt is informed and believes that the Beggars
7  Banquet label in early 1985 released "Smash You" in two other formats: a twelve
8  inch single and a two twelve inch record set. Mr. Reinhardt is informed and
9  believes that both of these formats named Richie Beau as the composer of "Smash
10 You."

11      31.    In 1987, Plaintiff left the "Ramones" to pursue other career interests.
12      32.    Upon information and belief, Mr. Reinhardt alleges that the Ramones
13 played their last live show in 1996.

14      33.    On or about April 15, 2001, the lead singer of the Ramones (and one
15 of its four founding members) Jeffrey Hyman (also known as "Joey Ramone") died
16 of cancer. On or about March 18, 2002, the Ramones band was inducted into the
17 Rock and Roll Hall of Fame. On or about June 5, 2002, the Ramones' main
18 songwriter and another founding member of the group, Douglas Colvin (also
19 known as "Dee Dee Ramone"), died at his Los Angeles home.

20      34.    Mr. Reinhardt is informed and believes that these three events caused
21 media and popular interest in the Ramones and their music to surge. Mr. Reinhardt
22 is further informed and believes and on that basis alleges that sales of each of the
23 group's recordings increased.  Furthermore, Mr. Reinhardt is informed and
24 believes that the resurgence of interest caused old albums to be expanded and
25 remastered and brought new compilations compact discs to market. Recently, a
26 major television marketing campaign for ATT Wireless, a national wireless phone
27 company, used the Ramones' song, "Blitzkrieg Pop."
28

-11-

COMPLAINT

1    35.    Mr. Reinhardt is informed and believes that Warner Records and

2  Rhino released in 2002 an expanded and remastered version of the album "Too

3  Tough To Die" on compact disc. Attached as Exhibit "3" is a true and correct copy

4  of liner notes from the expanded and remastered "Too Tough To Die." Unlike the

5  initial release, the expanded and remastered version of "Too Tough To Die"

6  contains twelve bonus tracks, including "Smash You."

7    36.    As evident from the liner notes at pages 45 and 46 herein, the

8  expanded and remastered "Too Tough To Die" compact disc fails to give

9  songwriting credit to Mr. Reinhardt for "Smash You." Instead, writing credit is

10  attributed to "the Ramones," a songwriting association apparently consisting of

11  Jeffrey Hyman, Douglas Colvin, and John Cummings (also known as "John

12  Ramone").

13    37.    Furthermore, Mr. Reinhardt is informed and believes that in early

14  2003 Warner Records and Rhino released a new compact disc compilation of

15  Ramones songs entitled "Loud, Fast Ramones: Their Toughest Hits." This

16  collection included in the first 50,000 copies an eight-song bonus compact disc

17  entitled "Ramones Smash You! * Live '85" that contains "Smash You" again

18  credited to "the Ramones" rather than Mr. Reinhardt. A true and correct

19  photocopy of the bonus compact disc is attached hereto as Exhibit "4." This bonus

20  compact disc is a recording of a Ramones live show in England in 1985 when Mr.

21  Reinhardt drummed for the Ramones.

22    38.    The advertisements (including those released in this judicial district)

23  for "Loud, Fast Ramones: Their Toughest Hits" highlighted that the first 50,000

24  copies included a limited edition bonus compact disc, "Ramones Smash You! *

25  Live '85." A true and correct copy of an advertisement for "Loud, Fast Ramones:

26  Their Toughest Hits" which ran in *LA Weekly* in late February 2003 is attached as

27  Exhibit "5."

28

-12-

COMPLAINT

39. On "Loud, Fast Ramones: Their Toughest Hits," prominent mention is made in a sticker affixed to front of the compact disc of the fact that Johnny Ramone, Defendant John Cummings, "assembled" the songs in this compilation. A true and correct the front of the compact disc's cover is attached hereto as Exhibit "6."

40. Cummings' assembly of the songs on "Loud, Fast Ramones: Their Toughest Hits" indicates that John Cummings/Johnny Ramone has primarily acted as the band's de facto business manager. One person who is familiar with the Ramones' inner workings noted that: "'Every time I would see Johnny [Defendant Cummings] backstage, it would be like, "When's our next job?" It was never a gig or a date or a show. In Johnny's own words, he was the businessman.'" The Story of The Ramones, p. 11.

41. Likewise, in his book, Lobotomy: Surviving the Ramones, Thunder's Mouth Press 2000, Dee Dee Ramone (Douglas Colvin) depicted Cummings as the self-appointed leader of the band.

42. Cummings is known as a very careful businessman. As Everett True noted in his recent book about the Ramones, "Johnny--the consummate professional--kept records about everything concerning the band." The Story of The Ramones, page 21.

43. Furthermore, Cummings made certain that the Ramones would not be cheated. In a recently published interview, Arturo Vega, the Ramones lighting manager, made clear that Johnny Ramone carefully managed every aspect of the Ramones' business:

> "That was Johnny -- he may not have been creative but he kept things together. He looked after the band and the band's interests. He protected the band from unscrupulous promoters and record companies." The Story of The Ramones, page 196.

-13-

44.    Mr. Reinhardt is informed and believes and on that basis alleges that as the Ramones' de facto band manager and a principal of Taco Tunes and Ramones Productions, Cummings has consistently acted to further his own financial interest in the Ramones, often at the expense of his band mates' interests. For example, in February 2003, Marky Ramone (Marc Bell, the Ramones' drummer from 1979 to 1983 and 1987 to 1996) told *NY Rock*, an online music publication that Cummings' reaction to the death of Joey Ramone and Dee Dee Ramone was "'Who cares? It will sell more records.'"

45.    Mr. Reinhardt is informed and believes and on that basis alleges that Defendants, and each of them, are either directly liable for, liable for inducing, contributing to, or vicariously liable for, the misappropriation of "Smash You" by virtue of their conduct which includes:

a.    Cummings, in his role of de facto business manager of the Ramones, directing Herzog and others to strip Mr. Reinhardt's writing credit from "Smash You;"

b.    Acting in concert with Cummings, Herzog (personally and on behalf of Herzog and Straus) using his power as a manager of Taco Tunes and Ramones Productions caused these entities to replace Mr. Reinhardt's songwriting credit on "Smash You" with "the Ramones;" and

c.    Warner Records and Rhino, as the record labels responsible for the release, distribution and advertisement of the expanded and remastered "Too Tough To Die" and "Loud, Fast Ramones: Their Toughest Hits," by failing to credit properly Mr. Reinhardt as the writer for "Smash You."

46.    Mr. Reinhardt learned of the misappropriation of the writing credit for "Smash You" in the spring of 2003. Upon learning of the misappropriation, Mr. Reinhardt sent a letter dated April 10, 2003 to Herzog, the certified public accountant who manages the Ramones' royalties. In this letter, attached hereto as

-14-

1
2      **FIFTH CLAIM FOR RELIEF**
3        Breach of Contract
4    (Against Taco Tunes, Inc. and Ramones Production, Inc.)
5
6   78. Plaintiff incorporates the allegations set forth in paragraphs 1 through
7 77 of this Complaint as though fully set forth at length.
8   79. On or about August 1, 1984, Mr. Reinhardt entered into a contract
9 with Taco Tunes and Ramones Productions. A true and correct copy of most of
10 this contract is attached hereto as Exhibit "11." Mr. Reinhardt has not been able
11 to locate two exhibits that were apparently part of this contract: Exhibit "A," the
12 Ramones' record contract referred to in paragraph 1(h) of the contract and Exhibit
13 "C," the songwriting agreement between the Ramones and Taco Tunes referred to
14 in paragraph 10(b) of the contract. The subject matter of this contract was Mr.
15 Reinhardt's rights and duties as a member of the Ramones with respect to the
16 group's recordings. As part of this contract, Ramones Productions agreed that Mr.
17 Reinhardt would receive certain royalty payments.
18   80. Specially, Ramones Productions agreed in paragraph 8 of the contract
19 that royalties should be calculated on the following basis:
20   a. With respect to Masters included on or recorded at the same time as the
21 first LP recorded hereunder, Company [Ramones Productions] shall pay Artist a
22 royalty equal to 11.8% of all royalties paid to Company or credited to Company's
23 account pursuant to the Record Contract;
24   b. With respect to Masters included on or recorded at the same time as the
25 second LP recorded hereunder, Company [Ramones Productions] shall pay Artist a
26 royalty equal to 18.9% of all royalties paid to Company or credited to Company's
27 account pursuant to the Record Contract;
28

-22-

---