# EXHIBIT F

AGREEMENT made, ~~this~~ AS OF THE 1st day of August, 1984 by and between RICHARD REINHARDT, a/k/a RICHIE BEAU, a/k/a RICHIE RAMONE (hereinafter referred to as "Artist"), c/o George R. Fearon, Esq., Phillips, Nizer, Benjamin, Krim & Ballon, 40 West 57th Street, New York, New York 10019 and RAMONES PRODUCTIONS, INC., c/o Mr. Ira Herzog, Herzog & Strauss, 155 East 55th Street, New York, New York 10022 (hereinafter referred to as "Company") and Taco Tunes, Inc. c/o Ira Herzog, Herzog & Strauss, 155 East 55th Street, New York, New York (hereinafter referred to as "Publisher").

W I T N E S S E T H:

1. For the purposes of this agreement, the following terms shall have the following meanings:

(a) "The Ramones" refers to the musical group publicly known as The Ramones and to John Cummings a/k/a/ Johnny Ramone, Jeff Hyman a/k/a/ Joey Ramone and Douglas Colvin a/k/a/ Dee Dee Ramone, the three individuals who are currently members of such group.

(b) "Master" means the equivalent of a 7 inch, 45 rpm, single-sided recording embodying the recorded performances by "The Ramones" and intended for use in the manufacture and sale of phonograph records.

(c) "LP" means a 12 inch, 33-1/3 rpm, long playing double-sided phonograph record consisting of not less than nine (9) masters.

EXHIBIT 11 PAGE 57

(d) "Records", "phonograph records", "recordings" and "derivatives" means all forms of reproductions including pre-recorded tapes and discs and electronic video recordings, now or hereafter known, manufactured or sold primarily for home use, school use, juke box use or use on means of transportation whether embodying:

(i) sound alone; or

(ii) sound coupled with visual images, e.g. "sight and sound" devices.

(e) "Recording Costs" means the costs incurred and paid for by Company for the production of master recordings of performances by "The Ramones". Recording costs include the cost of studio and rehearsal hall rentals, instrument rental and cartage, all musicians, vocalists, arrangers, etc., payments to a trustee or fund based on wages to the extent required by any agreement between Company and any labor organization or trustee, all studio, tape, engineering, editing, mastering, mixing and dubdown, union scale payments, outside producer's fees (i.e. fees paid to producers other than the Ramones or any of them) and other costs and expenses incurred in producing Masters which are customarily recognized as Recording Costs in the phonograph record industry.

(e) "Composition" means a musical composition or medley consisting of words and/or music, whether in the

form of instrumental and/or vocal music, contained on a Master.

(f) "Controlled Composition" means a composition written or composed, in whole or in part, by Artist, alone or in collaboration with others, which is contained on a Master.

(g) "Territory" means the world.

(h) "Record Contract" means the agreement between SIRE Records and Company and all amendments, extensions and revisions thereof or any replacement or substitution therefor. A copy of the Record Contract is attached hereto as Exhibit A.

2. Company hereby employs Artist as a recording artist and musician for the purpose of making master recordings embodying the performances of The Ramones.

3. (a) Artist will render services at recording sessions scheduled at times and places designated by Company. The Compositions to be recorded shall be designated by Company. Artist shall render his services to the best of his ability and in accordance with first class standards of performance in the phonograph record industry. Upon Company's request and at Company's reasonable discretion, Artist shall repeat any performances recorded hereunder.

(b) Company will employ Artist pursuant to the terms of this Agreement for the recording of a minimum of three

consecutive studio LPs by The Ramones. Company acknowledges that the first of such LPs is now in the process of being recorded.

4. Artist warrants and represents that no contract or agreement of any kind is presently in existence which would interfere in any manner with the performance of this agreement by Artist and that Artist is under no disability, restrictions or prohibitions with respect to his right to sign and perform under this agreement.

5. The Masters to be recorded hereunder will, from the inception of their creation, be considered as "works made for hire" for Company within the meaning of the U.S. Copyright Law. All records made from these Masters, together with the performances embodied therein, are, from the inception of their creation, entirely the property of Company in perpetuity, throughout the Territory, free of any claim whatsoever by Artist or by any persons deriving any rights or interests from Artist, and Company shall have the right to secure the sound recording (P) copyright in and to the Masters in Company's name as the owner and author thereof and to secure any and all renewals of such copyright. (The foregoing shall not, however, vest in Company any rights in the copyright of the Controlled Compositions, as opposed to the recordings thereof contained on the Masters). Artist shall execute and deliver to Company such instruments of transfer and other documents regarding the

EXHIBIT 11 PAGE 16

rights of Company in the Masters as Company may reasonably request to carry out the purposes of this agreement. Company and its licensees shall have the sole and exclusive right to use the Master throughout the Territory or any part thereof in any manner they see fit, including, without limitation, the sole and exclusive right in perpetuity and throughout the Territory or any part thereof in any manner they see fit, including, without limitation, the sole and exclusive right in perpetuity and throughout the Territory:

(a) to manufacture, advertise, sell, distribute, lease, license or otherwise use or dispose of the Masters and phonograph records embodying the Masters, in any or all fields of use, by any method now or hereafter known, upon such terms and conditions as Company or its licensees may elect or, in their sole discretion, to refrain therefrom;

(b) to perform the Masters publicly and to permit the public performance thereof by means of radio broadcast, television broadcast or any other method now or hereafter known;

(c) to use and publish the name (including all professional names), photograph and biographical material of Artist in connection with the promotion, exploitation and sale of derivatives of the Masters; and

(d) to use and to permit others to use the Masters in time synchronization with visual images.

6.   Company shall pay all Recording Costs and shall make all minimum union scale payments required to be made to Artist in connection with Artist's recording services hereunder.  Except as provided in paragraph 7 hereof, no such costs or payments, nor any other costs or expenses incurred by Company in recording the Masters shall be recoupable from royalties payable to Artist hereunder.

7.   (a)  For the purpose of this agreement:

(i)  "Company's Recording Advance" means the total sum paid to Company or to others on behalf of Company for the delivery of each LP to be recorded hereunder (including amounts paid upon the commencement of recording and upon the delivery of the Masters) pursuant to the Record Contract.

(ii)  "Deductible Costs" means Recording Costs and manager's commission, which commission shall in no event exceed twenty percent (20%) of the Company's Recording Advance.  No other costs or expenses are to be considered Deductible Costs.

(iii)  "Member's Share" means the percentage of monies received by Company from the sale, use, license or exploitation of the Masters recorded hereunder which would be payable by Company to each member of the Ramones if such monies were divided equally, without deduction, among all members of The Ramones.

EXHIBIT  I)

(b) Upon completion of the Masters for each LP recorded hereunder, Company shall pay to Artist a nonreturnable advance which shall be recouped from any royalties payable to Artist pursuant to this Agreement ("Artist's Advance"). Artist's Advance shall be computed in the following manner:

(i) With respect to the first LP recorded hereunder, Artist's Advance shall be 11.8% of the difference between Company's Recording Advance and Deductible Costs ~~or $5,000, whichever is greater~~.

(ii) With respect to the second LP recorded hereunder, Artist's Advance shall be equal to 18.9% of the difference between Company's Recording Advance and Deductible Costs ~~or $7,500., whichever is greater~~.

(iii) With respect to the third LP recorded hereunder, Artist's Advance shall be equal to 23% of the difference between Company's Recording Advance and Deductible costs ~~or $10,000., whichever is greater~~.

(iv) With respect to all other Masters recorded hereunder, Artist's Advance shall be equal to a full Member's Share of the difference between Company's Recording Advance and Deductible Costs.

8. Company shall pay to Artist a percentage of all royalties payable to Company pursuant to the Record Contract

EXHIBIT 11 PAGE 63

for sale or use of records recorded hereunder whether those royalties are computed as a percentage of the records' retail price or as a percentage of Company's net receipts in respect of such sale or use.

(a) With respect to Masters included on or recorded at the same time as the first LP recorded hereunder, Company shall pay Artist a royalty equal to 11.8% of all royalties paid to Company or credited to Company's account pursuant to the Record Contract.

(b) With respect to Masters included on or recorded at the same time as the second LP recorded hereunder, Company shall pay Artist a royalty equal to 18.9% of all royalties paid to Company or credited to Company's account pursuant to the Record Contract.

(c) With respect to Masters included on or recorded at the same time as the third LP recorded hereunder, Company shall pay Artist a royalty equal to 23% of all royalties paid to Company or credited to Company's account pursuant to the Record Contract.

(d) With respect to all other Masters recorded hereunder, Company shall pay Artist a full Member's Share of all royalties payable to Company pursuant to the Record Contract.

(e) With respect to records other than Singles not consisting entirely of Masters recorded hereunder, Ar-

tist's royalty shall be pro-rated by multiplying the royalty otherwise payable by a fraction, the numerator of which shall be one (1) and the denominator of which shall be the total number of Masters recorded hereunder which are contained on such Records.

(f) The payments to Artist hereunder shall be computed in the same manner (i.e., according to the same provisions for "free goods", reserves, percentages of sales, escalations based on sales, container deductions, retail list price, number of units for which royalties are payable, etc.) as the royalties payable to Company hereunder are computed pursuant to the Record Contract. Artist shall not be paid a royalty for the sale or use of records including the Master recorded hereunder in respect of which no royalty is received by Company or credited to Company's account.

(g) The payments to Artist hereunder shall be determined and paid in the same manner and at the same time as royalty payments to the three members of The Ramones are determined and paid in respect of the Masters recorded hereunder except that, if such payments to any or all of the three members of the Ramones are reduced by the amount of unrecouped advances, which advances were not shared in by Artist, the payments to Artist hereunder shall not be similarly reduced.

9.  Company warrants and represents that it owns the exclusive rights to the recording services of the Ramones and that it will continue to own said rights for the duration and term of this agreement.  Company further warrants and represents that the Record Contract is currently in effect and that same accords Sire options for at least two LPs in additon to the one currently being recorded.  Company further warrants and represents that it has the power and authority to enter into this agreement.

10.  A list of Controlled Compositions together with the percentage of Artist's contributions thereto which are included hereunder is attached hereto as Exhibit B.  Additional Controlled Compositions recorded hereunder will automatically be included in Exhibit B.

(a)  Controlled Compositions included on records recorded hereunder are hereby licensed to Company at the applicable royalty rate and on the same basis provided in the Record Contract.  Artist acknowledges that the applicable rate may be less than the minimum statutory copyright royalty rate contained in the United States Copyright Act.

(b)  Artist agrees to enter into a Songwriter's Agreement with Publisher with respect to each Controlled Composition included on records recorded hereunder.  The Songwriter's Agreement will be in the same form and contain the same terms as the Songwriter's Agreement currently in effect between

the members of the Ramones and Publisher, a copy of which is attached hereto as Exhibit C.

(c) Publisher, which is a signatory to this Agreement, agrees to accord Artist credit as a writer for each Controlled Composition on all copies of records recorded hereunder, on all printed copies of the Controlled Composition and in all other instances where such credits are customarily accorded. Publisher represents and warrants that there is currently in effect a co-publishing agreement between Publisher and Warner Bros. Music pursuant to which Publisher receives not less than seventy-five percent of gross publishing revenues received by Warner Bros. Publisher further warrants and represents that it distributes to the members of the Ramones all sums received by it in respect of their compositions without any deductions and that such distributions are pro-rated according to each songwriter's contribution to the composition. Publisher agrees that the Controlled Compositions delivered by Artist hereunder will be exploited by Publisher in the foregoing manner and that Publisher will pay Artist all sums received by it from its exploitation of the Controlled Composition, without any deductions whatsoever, based upon Artist's contribution to the Controlled Composition. Artist agrees, upon delivery of Controlled Compositions, to inform Publisher of the percentage of his contribution to the creation of such compositions.

EXHIBIT 11 PAGE 67

(d) Nothing herein is intended to prevent or preclude Artist from receiving public performance royalties throughout the world directly from ASCAP.

(e) The parties hereto acknowledge and agree that publishing royalties and recording royalties payable hereunder are not cross-collateralized and, therefore, in no event shall royalties payable to Artist by Publisher hereunder be retained pending recoupment by Company of Artist's Advances or of any other advance payments to Artist or charges against Artist pursuant to this Agreement.

11. Accountings as to royalties payable hereunder shall be made to Artist within sixty (60) days after Company has received statements and payments pursuant to the Record Contract, together with copies of such statement and the payment of accrued royalties, if any, earned by Artist during the periods covered by such statements. All royalty statements and all other accounts rendered to Artist shall be binding upon Artist and not subject to any objection by Artist for any reason unless specific objection in writing, stating the basis thereof, is given to Company within two (2) years from the date rendered. In the event Artist fails to timely object then Artist shall be foreclosed from maintaining any action, claim or proceeding against Company in any forum or tribunal with respect to any statement or accounting due hereunder unless such action, claim or proceeding is commenced against Company in a court of competent jurisdiction within two (2) years after the

date such statement or accounting is rendered. Artist shall have the right to appoint an accountant or attorney to examine Company's books and records insofar as the same pertain to this agreement, provided that such inspection shall take place at Company's offices during normal business hours, on reasonable written notice, not more frequently than once in any calendar year during which Artist receives a statement and at Artist's sole cost and expense.

12. Company and Publisher acknowledge that Artist's services hereunder are non-exclusive and that he may render the same or similar services to others so long as they do not prevent Artist from performing his obligations under this Agreement.

13. This agreement has been entered into in the State of New York, and the validity, interpretation and legal effect of this agreement shall be governed by the laws of the State of New York applicable to contracts entered into and to be performed entirely within the State of New York. All claims, disputes or disagreements which may arise out of the interpretation, performance, or breach of this agreement shall be submitted exclusively to the jurisdiction of the state courts of the State of New York or the Federal District Courts located in New York City. Any process in any action or proceeding commenced in such courts, arising out of any such claim, dispute or disagreement, may among other methods be served by delivering or mailing the same, via registered or certified mail, ad-

dressed to the address first above written. Any such delivery or mail service shall be deemed to have the same force and effect as personal service within the State of New York. This writing sets forth the entire understanding between the parties and cannot be modified, except by an instrument in writing signed by Artist and Company.

14. No waiver of any provision of or any default under this agreement shall constitute a waiver of compliance thereafter with the same or any other provisions or of the right to enforce the same or any other provision thereafter. The invalidity of unenforceability of any part of this agreement shall not affect the validity or enforceability of the balance thereof.

IN WITNESS WHEREOF, the parties hereto have executed this agreement the day and year first above written.

_____
Richard Reinhardt

RAMONES PRODUCTIONS, INC.

By: _____

TACO TUNES, INC.

By: _____

EXHIBIT B

| Title | Songwriter | % of contribution |
|---|---|---|
| Humankind | Richie Ramone | 100% |
| Smash You | Richie Ramone<br>Dee Dee Ramone | |